**TRUE NORTH COMMUNICATIONS INC., a Delaware corporation, Plaintiff,**

v.

**PUBLICIS S.A., a French corporation, and Publicis Communication, a French corporation, Defendants.**

Civil Action No. 16039–NC.

Court of Chancery of Delaware, New Castle County.

Argued: Dec. 22, 1997.
Decided: Dec. 23, 1997.
Revised: Jan. 15, 1998.

---

**6.** *Id.*

**9.** *Id.*

Kenneth J. Nachbar, Jon E. Abramczyk, Donna L. Culver, and Jessica Zeldin, of Morris, Nichols, Arsht & Tunnell, Wilmington; Robert A. Atkins, Martin London, Danya E. Perry, and Roberto Finzi, of Paul, Weiss, Rifkind, Wharton & Garrison, New York City, and Sidley & Austin, Chicago, IL, for plaintiff.

Robert K. Payson, and Arthur L. Dent, of Potter, Anderson & Corroon, Wilmington; Philip K. Howard, C. William Phillips, and Daniel M. Mandil, of Howard, Darby & Levin, New York City, for defendants.

## OPINION

CHANDLER, Chancellor.

Plaintiff True North Communications, Inc. ("True North") seeks preliminary injunctive relief against defendants Publicis S.A. and Publicis Communication (collectively "Publicis"), requiring them to refrain from opposing True North's pending merger with Bozell, Jacobs, Kenyon & Eckhardt, Inc. Publicis is True North's largest shareholder, holding 18.4% of True North's outstanding shares, and it objects to the proposed Bozell merger. As a result, Publicis has commenced a tender offer of $28 per share for True North stock, conditioned on defeat of the Bozell merger proposal, and has solicited proxies from other investors to that end.

On December 16, 1997, I granted True North's motion for a temporary restraining order against Publicis' tender offer and proxy solicitation, finding that True North alleged a colorable claim on the merits and that Publicis' actions, unless enjoined, threatened irreparable injury to True North. A hearing on True North's motion for a preliminary injunction was held on December 22, with the parties providing briefs, an extensive documentary record, and three witnesses: Lloyd N. Cutler, outside counsel to True North's Special Committee; Maurice Levy, Chief Executive Officer and Director General of Publicis; and Thomas Kuhn, outside counsel for Publicis. Before analyzing the legal claims, it is important to describe, in some detail, the factual background to this controversy.

## I. BACKGROUND FACTS

True North Communications, Inc., a Delaware corporation, is a communications company that operates marketing and advertising agencies in the United States, Canada, Europe, Latin America and Asia. True North has annual revenues of approximately $500 million.

Defendants Publicis S.A. and Publicis Communication are both French corpora-

tions. Publicis Communication owns and operates numerous advertising agencies principally in Europe.

In January 1989, Publicis and True North (then known as Foote, Cone & Belding) entered into a joint venture that united the two companies' operations and established a network of advertising agencies throughout Europe. As part of the joint venture, Publicis and True North purchased significant minority shareholdings in each other. True North currently owns 26.5% of Publicis' common stock, and Publicis owns 18.6% of True North's common stock.

The joint venture, known as Publicis●FCB, was in trouble almost from the beginning. The alliance quickly "descended into acrimony, into high-profile litigation and into mistrust." A recent article in *Business Week* described the parties' joint venture as "A Marriage Made in Hell." Earlier this year, the parties decided that a divorce—a dissolution of the joint venture—was the only way to end the discord and mistrust.

The terms of the joint venture's dissolution were set forth in a Memorandum of Agreement dated February 19, 1997. Pursuant to the Memorandum of Agreement, True North and Publicis agreed to create "two separate agency networks, one owned and controlled by Publicis and the other owned and controlled by True North," which "would have the ability to function globally and independently of one another." The parties retained ownership of each other's stock.

## A. The Pooling Agreement

An overriding objective of each party after the dissolution was to be able to engage in large acquisitions to build the separate, independent, worldwide agencies critical to their futures in the advertising industry. In order to effect this mutual objective, on May 19, 1997, True North and Publicis signed the Pooling Agreement, one of eight agreements annexed to the Memorandum of Agreement. These agreements were designed to disentangle the companies' business and to divide ownership of the advertising agencies operated by the joint venture.

Under the provisions of the Pooling Agreement, the parties agreed to provide assistance and support to ensure that future transactions could employ pooling of interests accounting. Specifically, pursuant to § 1.1 of the Pooling Agreement, Publicis agreed to (a) provide True North with a "pooling letter" needed to effect a pooling of interests transaction and to "(b) if reasonably requested, take such other action in support of the transaction (other than a commitment to vote for such transaction) as would be customary with respect to an acquisition or other similar business transaction in which True North may participate...." This was a reciprocal obligation.

The pooling letter assurance was essential to both parties, since they were both contemplating future acquisitions. As the parties describe it, with pooling of interests accounting, the combined company does not have to write-off or amortize the acquired company's good will, which accounts for a substantial part of the acquired advertising company's value. For all practical purposes, pooling transactions are the only way to accomplish major transactions in the advertising business, a fact which has not been disputed in this action, or at least not seriously.

For a company to qualify for pooling of interests accounting, all affiliates, generally defined as shareholders holding 10% or more of the company's stock, must consent and promise not to divest any stock for a specific period of time. The pooling letter Publicis agreed to provide to True North pursuant to the Pooling Agreement is a typical form of consent. The ability to withhold such consent is the ability to kill a pooling of interests transaction.

Publicis' obligation to provide True North with a pooling letter was not unconditional. Publicis had the right to withhold the pooling letter, unless:

(i) True North obtained a fairness opinion from a nationally recognized investment bank;

(ii) A majority of the non-management directors of True North voted to approve the terms and conditions of the contemplated transaction; and

(iii) True North obtained pooling letters (or other forms of consent) from all other non-*de minimis* affiliates of True North.

Further, under § 1.1.1, Publicis could withdraw its pooling letter if the contemplated transaction were not approved by majority vote of all outstanding shares of True North.

B. *True North's Proposed Acquisition of Bozell*

Subsequent to the unwinding of the joint venture with Publicis, True North engaged in extensive negotiations to acquire Bozell, Jacobs, Kenyon & Eckhardt ("Bozell"), an international communications company with advertising and public relations agencies in 53 countries around the world. Bozell has annual revenues of approximately $450 million.

On July 30, 1997, True North's Board of Directors approved the acquisition of Bozell, subject to shareholder approval. The next day, True North announced that Bozell had agreed to a stock for stock merger.

The Merger Agreement, which will terminate by its own terms if the merger is not closed by December 31, 1997, requires the approval of both True North's and Bozell's shareholders. Moreover, Bozell may terminate the Merger Agreement if True North's shareholders do not vote on the merger by December 31, 1997.

On November 10, 1997, Publicis Chairman Maurice Levy sent a letter to True North stating Publicis' position that True North's proposed transaction with Bozell was contrary to the best interests of True North's shareholders. As an alternative to the Bozell transaction, Levy stated that Publicis was prepared to propose a merger with True North.

On November 17, one week after sending the letter to True North, Publicis disclosed publicly the text of the letter. The stock market reacted dramatically. On the day of the announcement, the price of a share of True North increased from $23 to over $26. Approximately 1,000,000 shares were traded—a volume more than twelve times True North's average daily trading volume.

Also on November 17, True North filed a complaint in the Court of Chancery, requesting that the Court order Publicis to provide True North with information necessary for True North to obtain Securities and Exchange Commission approval of the Bozell transaction. Publicis was also notified, at this time, of its obligation to "support a True North acquisition" under § 1.1(b) of the Pooling Agreement.

Publicis agreed to provide the requested information in response to True North's complaint. Thereafter, True North obtained SEC approval, set a November 18, 1997 record date for the shareholder vote on the Bozell proposal and scheduled a shareholders meeting for December 30.

Beginning on or about November 25, there was a flurry of activity that ultimately evolved into the litigation now before this Court. First, Publicis filed suit against True North and its directors in the United States District Court for the Northern District of Illinois on several grounds, including breach of fiduciary duty in proposing a merger with Bozell. Publicis' chief objective, however, was to block the merger between True North and Bozell. Second, on November 26, True North requested that Publicis honor its obligations under the Pooling Agreement by refraining from acting in opposition to the Bozell Merger.

On December 3, True North answered the complaint in the federal action and asserted counterclaims, alleging, among other things, that Publicis had breached its contractual duty to support the Bozell transaction. Also on December 3, True North sent a letter to Publicis requesting that Publicis "refrain from taking any actions against the proposed Bozell transaction (with the exception of voting your shares against the transaction)," pursuant to § 1.1(b) of the Pooling Agreement.

The next day, Levy sent another letter to the True North Board of Directors stating that Publicis intended to commence a hostile tender offer for 33% of True North's outstanding shares that, when combined with Publicis' existing holdings, would give it control of True North. The letter stated that the tender offer was expressly conditioned on

the termination of the Bozell Merger Agreement. On the same day, Publicis filed a preliminary proxy statement with the SEC for the purpose of soliciting True North shareholders to vote against the Bozell merger.

On December 5, True North filed a motion for a temporary restraining order in the United States District Court for the Northern District of Illinois, claiming that Publicis' actions to defeat the Bozell merger violated Publicis' contractual obligation to support True North's acquisitions under § 1.1(b) of the Pooling Agreement. At a hearing scheduled the same day, United States District Judge Gottschall concluded that the Pooling Agreement was ambiguous, and that extrinsic evidence would be necessary to interpret the agreement. Following an evidentiary hearing on December 8, the federal court ruled in favor of True North and entered a temporary restraining order prohibiting Publicis from going forward with its hostile tender offer and proxy solicitation. This order was re-characterized on December 10 as a preliminary injunction order so as to permit an immediate appeal.

Five days later, the United States Court of Appeals for the Seventh Circuit vacated that order, holding that under the forum selection clause, claims arising under § 1.1 of the Pooling Agreement should be determined by a Delaware court. In the evening hours of December 15, True North applied to this Court for a temporary restraining order. In the early morning hours of December 16, after hearing from both parties, this Court set an expedited schedule with a hearing date of December 22, and temporarily enjoined Publicis from continuing its hostile tender offer or proxy solicitation.

## II. LEGAL STANDARD

The standard applicable to True North's motion for preliminary injunctive relief is well settled under Delaware law. In order to obtain preliminary injunctive relief, True North must establish a reasonable probability of success on the merits, a reasonable likelihood that it will suffer irreparable harm absent the injunction, and that the harm to True North if relief is denied outweighs the harm to Publicis if the injunction is granted. *Revlon, Inc. v. MacAndrews & Forbes Holdings,* Del.Supr., 506 A.2d 173, 179 (1986).

Whether in the circumstances of this case True North is entitled to preliminary injunctive relief turns on the interpretation of the Pooling Agreement. If Publicis' hostile tender offer and proxy contest violate an enforceable obligation under the agreement, then Publicis' breach may entitle True North to the injunction it seeks.

Before turning to the arguments surrounding the agreement, however, it is important to describe the underlying legal principles applicable in the context of interpreting a contract provision. Under Delaware law, courts must first determine whether the contractual language in question is ambiguous. *Bell Atlantic Meridian Systems v. Octel Communications Corp.,* Del.Ch., C.A. No. 14348, Allen, C., 1995 WL 707916 (Nov. 28, 1995). If the contract's terms are clear on their face, the Court is not permitted to examine parol evidence. Instead, the Court must apply the meaning that would be ascribed to the language by a reasonable third party. *See City Investing Co. v. Continental Cas.,* Del.Supr., 624 A.2d 1191, 1198 (1993).

If, however, the contract language in question is reasonably subject to more than one interpretation, the Court will consider parol evidence in order to ascertain the parties' intentions. *See Eagle Industries, Inc. v. DeVilbiss Health Care, Inc.,* 702 A.2d 1228, 1232 (1997).

## III. ANALYSIS OF CLAIMS

The central issue in this controversy is the meaning of just 40 words—out of thousands of words—in an agreement between sophisticated parties, represented by very sophisticated lawyers. True North contends that Publicis' actions to defeat the merger with Bozell (and no one denies that Publicis' actions are intended to destroy the Bozell merger) violate Publicis' contractual obligation to support True North's acquisitions. That obligation, True North insists, is found

in § 1.1 of the Pooling Agreement, which provides in its entirety as follows:

1.1. *Obligation of Publicis and Communication to Deliver Pooling Letter.* So long as Communication or any of its affiliates owns at least 10% of the issued and outstanding shares of True North Stock (as hereinafter defined), within 30 days after receiving a written request from True North delivered before the third anniversary of this Agreement, Publicis and Communication shall (a) furnish True North, and shall cause any designee of Communication serving on the Board of Directors of True North to furnish True North, with a "pooling letter", in substantially the form attached hereto as Exhibit A, or upon the request of True North, in such other form as is conventional for a transaction accounted for as a pooling of interests under generally accepted accounting principles applied in the United States, and, (b) if reasonably requested, take such other action in support of the transaction (other than a commitment to vote for such transaction) as would be customary with respect to an acquisition or other similar business transaction in which True North may participate; *provided* that Publicis and Communication may withdraw such pooling letter if any of the following conditions is not met within 90 days after Publicis and Communication shall have furnished such pooling letter.

(i) True North has obtained a fairness opinion from a nationally recognized investment bank with regard to the contemplated transaction;

(ii) A majority of the non-management directors of True North has voted to approve the terms and conditions of the contemplated transaction; and

(iii) True North has obtained pooling letters (or similar action) by all other non-*de minimis* affiliates of True North.

1.1.1. Not later than 90 days after Publicis and Communication shall have furnished the pooling letter, True North shall call a meeting of the shareholders of True North, to be held within a further 60 days, to vote on the contemplated transaction. If a majority vote of the outstanding shares of True North in favor of the contemplated transaction is not obtained at such meeting (or at an adjournment thereof within such 60 day period), Publicis and Communication may withdraw their pooling letter.

According to True North, the 40 words in dispute in subpart (b)—"if reasonably requested, take such other action in support of the transaction (other than a commitment to vote for such transaction) as would be customary with respect to an acquisition or other similar business transaction in which True North may participate"—require Publicis to take only actions to *support,* not oppose or impede, the Bozell acquisition. True North argues vigorously that the clear language of § 1.1(b), not to mention its equally clear drafting history, demonstrates that True North and Publicis intended to impose upon each other broad reciprocal obligations to support large acquisitions, as part of an agreement to cooperate in establishing "two separate agency networks, one owned and controlled by Publicis and the other owned and controlled by True North." *See* Plaintiff's Trial Exhibit, Tab 20, Ex. 3, February 19, 1997 Memorandum of Agreement, ¶ 2(a).

In striking contrast to True North's interpretation, Publicis vehemently contends that § 1.1(b) is clearly a "further assurances" clause. That is, Publicis argues that all subpart (b) adds to § 1.1 is Publicis' general assurance that it will provide any additional technical or ministerial information necessary to assist True North in its efforts to obtain pooling accounting treatment. In other words, Publicis reads subpart (b) as a catch-all contract provision by which a party, after making a precise commitment to perform in some manner, makes a vague, more general commitment to take other actions that are incidental to, and necessary for, the performance of the core commitment. For Publicis, the language in § 1.1(b) is crystal clear, but with a wholly different meaning than that which is ascribed to it by True North. Publicis says the language of subpart (b) merely confirms its agreement to provide a pooling letter and to cooperate in True North's effort to obtain pooling of interests accounting.

In further support of this interpretation, Publicis points to the fact that this reading of subpart (b) is buttressed by other provisions in § 1.1. For example, Publicis notes that § 1.1 does not even apply unless an affiliate owns at least 10% of True North's outstanding shares. In addition, § 1.1 does not appear to apply to cash transactions, although True North's witness, Lloyd Cutler, testified during the preliminary injunction hearing that he believed § 1.1 might very well apply to cash transactions as well as stock transactions. Finally, Publicis points to the title of the agreement and the heading of § 1.1—"Obligation of Publicis and Communication to Deliver Pooling Letter"—as indications that subpart (b) was intended to address only obligations incidental to the core commitment of providing a pooling of interest letter. This is the reading of the operative language so strongly urged by Publicis through its witnesses, including its Chairman, Maurice Levy, and its negotiating counsel, Martin Lipton and Thomas Kuhn.

■ I find the more compelling interpretative argument is on the side of True North. Publicis obligated itself to take action "in support of the transaction (other than a commitment to vote for such transaction)." The word "support" is not a vague term. Without listing every action that it might require a party to affirmatively undertake, it is a term ordinarily understood in the English language as incompatible with the launching of a hostile tender offer conditioned on abandonment or destruction of the very transaction the party is obligated in subpart (a) to assist by providing a pooling of interests letter. This was the straightforward reading advocated by True North's principal negotiating counsel, Lloyd Cutler, and I find it most persuasive.

Most tellingly, subpart (b)'s phrase "other than a commitment to vote for such transaction" has no coherent meaning if subpart (b) is read as a further assurances clause. By using words that commit Publicis to support a transaction, except that it is not committed to vote in favor of the transaction, the terms of subpart (b) address, in my opinion, a completely different subject than the concept that is addressed in subpart (a). Subpart (a)

is unmistakably designed to require Publicis to furnish True North with a pooling letter in a conventional form upon request. If subpart (b) were intended to provide "further assurance" that Publicis would provide information necessary to ensure a pooling of interests accounting treatment, it would have been very simple to have provided that Publicis "shall if reasonably requested provide such other information as is necessary to ensure that the transaction qualifies for pooling of interests accounting treatment." But that is not how subpart (b) is worded. To have the Court read subpart (b) as if it did read in this fashion would twist the ordinary meaning of common English words beyond recognition.

It also is noteworthy that the two conceptually distinct obligations set forth in subpart (a) and subpart (b) appeared in the February 19, 1997 Memorandum of Agreement almost *in haec verba*, with one important difference. In paragraph 24 of the Memorandum of Agreement, the two conceptually distinct obligations—furnishing True North with a pooling letter if requested *and* taking such other action if reasonably requested in support of a transaction in which True North might participate—were not set apart by subheadings (a) and (b). Draftsmen use subheadings deliberately, to signify by their use that concepts are separate and distinct. Cutler testified that was indeed the very reason the draftsmen of § 1.1 modified the language of paragraph 24 in the Memorandum of Agreement, to signify that the obligations in subparts (a) and (b) were separate and distinct contractual obligations.

Moreover, the clear terms of subpart (b) cannot be read as a mere "further assurances" provision because of the explicit carve out language inserted into subpart (b) at the insistence of Publicis' counsel. By requesting that explicit carve out, reserving the right to vote against the transaction, Publicis acknowledged that True North's unqualified right to reasonably request such other action in support of the transaction as would be customary with respect to an acquisition *included* the right to request that Publicis commit to vote for such a transaction. Even Publicis' counsel has acknowledged that the

carve out language, reserving Publicis' right to vote against the transaction, does not fit comfortably in the context of a "further assurances" clause. As a result, Publicis was forced to minimize the carve out language as "a mere shorthand" reference, recommended to make clear that by giving further assurances of Publicis' intention to provide pooling of interests accounting information, it did not thereby intend to waive any of its other rights as a True North stockholder.

Ultimately, I cannot accept Publicis' proffered explanation that the carve out language represents a shorthand form of protection for Publicis; nor can I accept the "further assurances" spin that Publicis attempts to place on the language of subpart (b) of § 1.1. First, if in fact the agreement only covers technical accounting issues, I am hard pressed to find a plausible explanation for why the contract commits Publicis to "support" transactions, rather than simply take steps necessary to ensure pooling of interests accounting. The latter phrase would have easily captured the meaning that Publicis now attempts to place on subpart (b).

Second, no explanation exists under Publicis' interpretation of § 1.1 as to why Publicis' voting rights were carved out. If Publicis were only expected under subpart (b) of § 1.1 to provide "ancillary" accounting information under the Pooling Agreement, why carve out the right to vote against the transaction? Publicis' explanation that the carve out is shorthand for a reservation of rights is equally implausible here. Publicis could easily have expressly reserved within the parenthetical the right to undertake a hostile takeover, solicit proxies or take other similar actions. This inexplicable mystery in the contract language is precisely why the district judge in the federal action found it "simply impossible" to accept Publicis' interpretation that subpart (b) is a "further assurances" provision. I too find it impossible to reconcile the carve out language with the current meaning that Publicis wants me to attach to subpart (b). The language simply will not bear the weight of this interpretation, an interpretation, so jarring to the common meaning and understanding of words that even Publicis' counsel admits they do

not "fit" comfortably within the interpretation Publicis advances.

Accordingly, I think a reasonable person should have had no expectation inconsistent with the plain and ordinary meaning of the 40 words in question. Those words, simply read, require Publicis to support (that is, not to take action designed to obstruct) a True North acquisition in the customary manner, except that Publicis has reserved the right ultimately to vote against a proposed acquisition. Viewed objectively by a reasonable person, I am of the opinion that the language of § 1.1(b) admits of only one reasonable meaning. Nevertheless, I recognize that the parties to this controversy have advanced completely inconsistent interpretations of the contract language in question.

Under Delaware law, when a provision of a contract is fairly susceptible to more than one interpretation, one may conclude that the provision is ambiguous. In that event, the interpreting court must look beyond the language of the contract to ascertain the parties' intentions. *See Eagle Industries, Inc. v. DeVilbiss Health Care, Inc.,* 702 A.2d 1228, 1232 (1997). Although I believe that the words in controversy cannot be read reasonably in the manner suggested by Publicis, I admitted all of the extrinsic evidence offered by the parties in order to ascertain the parties' intentions.

In the context of a preliminary injunction hearing, the parties ordinarily would present a paper record with respect to extrinsic evidence to be considered by the Court. In this case, however, the Court allowed the parties to provide not only affidavits and documents regarding the negotiating history of the disputed language, but also to present live testimony by witnesses directly involved in the contract negotiations. By and large, however, the extrinsic evidence offered by the parties is not in conflict and can be relied upon to arrive at a proper interpretation of the contractual terms in issue.

It is clear that a divorce or dissolution of the joint venture was in each party's economic self-interest. To that end, the parties agreed that each would go its own way and each would build a separate, independent global network. As Levy testified, the sepa-

ration agreement was intended to permit each party to "create and develop its own global venture." This intention and shared contractual objective is recited in the separation agreements themselves, which provide that "Publicis and True North agree to create two separate agency networks, one owned and controlled by Publicis and the other owned and controlled by True North." *See, e.g.*, Plaintiff's Trial Exhibit, Tab 20, Ex. 3, February 19, 1997 Memorandum of Agreement, ¶ 2(a). The testimony at the hearing also demonstrated that each party recognized that the parties would have to make acquisitions in order to develop these separate, global networks. Moreover, it became clear at the hearing that, at least within the advertising industry, "pooling of interests acquisitions" and "acquisitions" are synonymous. That is, because goodwill constitutes such a large part of the value of an advertising company, large acquisitions or transactions are virtually always undertaken by using the pooling of interests method of accounting.

In the discussions between True North and Publicis regarding the terms of their separation agreement and the process by which they would cooperate in going forward to create separate, independent networks, the focus of attention was on the ability of either party to interfere with that objective. As a result, on January 27, 1997, True North's Board of Directors adopted a resolution that agreed to the Memorandum of Agreement for the dissolution of the joint venture that was then under discussion, but with the qualification that the following protection be obtained:

> "Upon notification by True North Communications, Inc. of intent to participate in any acquisition, Publicis will not take any action to restrict True North Communications' ability to acquire agencies or companies using the pooling of interest accounting. (Reciprocal rights will be approved if required.)"

This Board resolution was transmitted to Levy, who was thus made aware of True North's concern. In addition, Levy later received and approved the minutes of that meeting. With True North's concern fully expressed, Publicis' counsel, Martin Lipton,

proposed a side letter to address it. For this side letter, Lipton suggested language that "Publicis and True North will cooperate in good faith in proposed acquisitions by the other to build their respective global networks." *See* Plaintiff's Trial Exhibit, Tab 10, Ex. 15, p. 2, ¶ 4 (letter dated January 31, 1997 from Lipton to Cutler .)

On February 6, 1997, after Publicis had offered to resolve the dispute over this issue by committing to "not unreasonably withhold a pooling letter if the transaction is not deemed by Publicis to be materially adverse to its investment," True North's Board met again and resolved to "obtain a clear commitment from Publicis to support future [True North] pooling transactions." *See* Plaintiff's Trial Exhibit, Tab 15, Ex. 11, p. 2. Levy also received and approved the minutes of this True North Board meeting.

Once again, although the concerns were communicated to Levy, usually via faxed copies of board minutes or via letters or phone calls from Stephen Vehslage (True North's lead negotiator on its Special Committee), the principal task of finding a solution to True North's concern was referred to Lipton and Cutler, the attorneys for Publicis and True North, respectively. On February 7, 1997, Lipton sent Cutler a revised side letter incorporating True North's request for a commitment from Publicis to provide a pooling letter and to "support" acquisitions. *See* Plaintiff's Trial Exhibit, Tab 31, Ex. 31. In this letter, Lipton proposed that if Publicis did not wish to support a particular pooling transaction proposed by True North, it alternatively could reserve the right to sell its True North shares back to True North. By February 19, however, Publicis had decided not to reserve the right to sell its stock in True North and agreed to provide a pooling letter as well as to support pooling acquisitions with one restriction. It requested an explicit carve out with respect to Publicis' obligation to support a True North acquisition, adding the words "other than a commitment to vote for the transaction."

Levy testified most emphatically that he never understood the agreement to require Publicis' commitment to support a True North acquisition. He believed, based on

statements by Vehslage, that True North was only concerned about pooling of interests accounting treatment. Importantly, however, Levy testified that he relied on his attorneys, Lipton in particular, to develop language that would resolve the controversy with True North.

On True North's side, Cutler testified unequivocally that the issue, from the perspective of True North, was far more than merely requiring Publicis to provide a pooling letter. Cutler testified that True North expressly bargained for a commitment from Publicis to support future acquisitions. Publicis responded, via Lipton, by suggesting the insertion of language that each party would "cooperate in good faith" in proposed acquisitions by the other. Nothing in the record indicates that the parties ever abandoned this mutual understanding. True North certainly did not waver in its determination to require a "firm commitment" from Publicis to support future pooling transactions.

Cutler testified that the negotiations on this point were "involved," and that True North agreed to the series of protections that Publicis demanded in return for Publicis' general obligation to support True North's acquisitions. As the agreement reflects, Publicis insisted that it have the right to withdraw its pooling letter (and thus destroy True North's proposed acquisition) if any of the following conditions were not satisfied: (1) True North failed to obtain a fairness opinion from a nationally—recognized investment bank with regard to the contemplated transaction; (2) True North failed to obtain a majority vote of the outside directors of True North approving the terms and conditions of the contemplated transaction; (3) True North failed to secure a majority vote of the outstanding shares of True North; or (4) True North failed to receive pooling letters (or similar forms of consent) from all other non-*de minimis* affiliates of True North.

Cutler also testified that Publicis insisted that the vote of True North's shareholders on any transaction be required to be a majority vote of all of the *outstanding* shares of True North stock. True North's negotiators preferred to require a majority of the shares being voted, provided there was a quorum, but Lipton insisted on behalf of Publicis that the vote be of all *outstanding* shares. The effect of this provision is to require a supermajority vote, since Publicis holds almost 20% of True North's stock and approximately 10% of stockholders typically fail to vote in elections. Accordingly, True North is required to obtain approval of 51% of the remaining 70% of its outstanding stock.

All of the negotiating history surrounding the Pooling Agreement and the Memorandum of Agreement of which it is a part, confirm what, in my opinion, is clear from the face of the documents. True North bargained for and received a contractual commitment from Publicis to support True North acquisitions, with the limited exception that Publicis is entitled to vote its True North shares as it deems fit. Publicis' effort to limit the phrase, "support True North transactions," to mean "provide ancillary information necessary to effectuate a pooling of interests accounting treatment" is belied, in my view, by two factors: first, the clear language of § 1.1(b) and second, the fact that the Pooling Agreement is not limited to pooling of interests accounting issues. The Pooling Agreement includes, for example, provisions that relate to the right to vote shares, the right to require the directors of True North to obtain a fairness opinion, and the right to hold a shareholder vote on any proposed transaction. In addition, testimony regarding the negotiating history and a review of documents that flowed back and forth between the parties, clearly demonstrate that each party understood True North's concern about obtaining a "clear commitment" from Publicis to support future True North pooling of interests transactions. This concern no doubt grew out of the difficult relationship between these parties over the years, including the mistrust and acrimony that characterized the joint venture. True North's Board was unwilling to accept the general language of Publicis' promise "to cooperate in good faith" or Publicis' generalized commitment to provide a pooling letter if requested. Publicis understood True North's concern and responded to it.

Ultimately, I am persuaded that these negotiations between the parties produced

§ 1.1, which protects True North from the risk that Publicis either might try to withhold a pooling letter in order to thwart a pooling of interests transaction or might attempt to thwart a transaction by other means, such as a proxy solicitation or a hostile tender offer. I find that subparts (a) and (b) of § 1.1 were negotiated to protect True North's interests against these risks. In return, subsections (i), (ii), and (iii) of § 1.1 and § 1.1.1 were negotiated to protect Publicis from having to support a transaction by True North that might not be in Publicis' interest. Like Judge Gottschall of the Northern District of Illinois, I find True North's interpretation of this agreement more persuasive and overwhelmingly supported by the testimony and extrinsic evidence presented by the parties. Accordingly, I am satisfied that True North has demonstrated a reasonable probability of success on the merits of its claim that Publicis has breached its contractual agreement to support True North's transaction with Bozell by launching a hostile tender offer and soliciting proxies conditioned on defeat of the Bozell transaction. I turn now to the issues of irreparable harm and balance of the equities.

## IV. IRREPARABLE HARM

The second prong of the preliminary injunction test requires the party seeking the injunction to demonstrate that it will suffer irreparable harm if the injunction is not granted. *Mills Acquisition Co. v. Macmillan, Inc.*, Del.Supr., 559 A.2d 1261, 1278 (1988). I find that True North has satisfied this burden in two ways. First, the contract executed by True North and Publicis—the Pooling Agreement—expressly provides that Publicis' breach of § 1.1 will constitute irreparable harm to True North, entitling True North to injunctive relief. Second, Publicis' actions threaten to destroy the proposed Bozell merger, a loss that cannot be quantified. This is the essence of irreparable harm.

■ The irreparable harm element of the injunction standard is established by Publicis' own contractual stipulation in § 2.4.2 of the Pooling Agreement. There, Publicis acknowledged that "a breach [of § 1.1] would cause a loss to True North which could not be reasonably or adequately compensated in damages in an action at law, that remedies other than injunctive relief could not fully compensate True North for a breach of said covenants and that, accordingly, True North shall be entitled to injunctive relief to prevent any breach or continuing breaches of this Agreement arising out of a request under section 1.1." This Court has previously upheld similar contractual stipulations in otherwise enforceable contracts. *See, e.g., Vitalink Pharmacy Services, Inc. v. Grancare, Inc.*, Del.Ch., C.A. No. 15744, Jacobs, V.C., 1997 WL 458494 (Aug. 7, 1997), slip op. at 23–24. In *Vitalink*, this Court held that one such contractual stipulation "alone suffice[d] to establish the element of irreparable harm" and refused to entertain defendant's arguments opposing plaintiff's right to seek injunctive relief based on that provision. *Id.*

Publicis insists that it never intended to contractually stipulate that its failure to "support the transaction" would constitute irreparable harm to True North, because it did not think that was what § 1.1 required. I reject this argument, as it depends on agreeing with Publicis' contention that § 1.1(b) is really a "further assurances" clause rather than a commitment to support—including, *inter alia*, not opposing—acquisitions by True North (other than promising to vote in favor of such transactions). I have already found that argument untenable. Defendants cannot now say there is no irreparable harm to True North upon Publicis' breach of § 1.1, given that it expressly says so in the contract. *Id.* at 24 n. 46 (quoting *SLC Beverages, Inc. v. Burnup & Sims, Inc.*, Del.Ch., C.A. No. 8860, Hartnett, V.C., 1987 WL 16035 (Aug. 20, 1987), slip op. at 6). Having carefully negotiated this contract, both Publicis and True North are bound by its terms. And in this case, those terms stipulate that a breach of § 1.1 by Publicis entitles True North to seek injunctive relief.

■ Even without the contract language conceding the irreparable nature of the injury to True North caused by Publicis' failure to support the proposed Bozell merger, it is nonetheless clear that True North will suffer irreparable harm if Publicis is not enjoined from pursuing its activities in opposition to

the merger. Publicis' opposition efforts threaten to destroy the Bozell merger, which is a unique acquisition opportunity for True North. The damage to True North caused by the loss of such an opportunity cannot be quantified. Thus, damages in an action at law would not be a sufficient remedy, and injunctive relief is appropriate.

## V. BALANCE OF EQUITIES

■ The third prong of the test for preliminary injunctive relief is the balance of equities. Under this prong, the plaintiff must demonstrate that the harm to the plaintiff if relief is denied outweighs the harm to the defendant if the injunction is granted. *Mills Acquisition Co.*, 559 A.2d at 1278–79. I am convinced that if I deny True North the preliminary injunction that it requests, True North would suffer a harm much greater than any harm Publicis could possibly suffer if I were to grant the injunction.

First, I find that because Publicis has no right to breach its contract with True North, Publicis cannot invoke general equity principles to save it from an injunction. Under the terms of the Pooling Agreement, Publicis contracted away its right to launch a hostile takeover of True North and also to solicit proxies in opposition to the Bozell merger. Accordingly, Publicis cannot now assert that it will be harmed due to the Court's enforcement of the rights and obligations for which it specifically bargained, and which were reduced to writing in the terms of the Pooling Agreement.

Second, Publicis invokes "equities" of the "shareholder right to receive information" and its own right to offer to buy True North shares. This is not an equity consideration in these circumstances, because I have already found that Publicis does not have the right to make a hostile tender offer under § 1.1(b) of the Pooling Agreement. On the contrary, under the Pooling Agreement, Publicis is contractually bound to support True North's acquisitions, not undermine them by launching a hostile tender offer *conditioned*

on the destruction of the very merger proposal it has covenanted to support. Additionally, I cannot ignore the fact that the market is now well advised of Publicis' opposition to this merger. Publicis made its November 10 letter to True North public, and one million True North shares immediately changed hands. Therefore, I find that no real threat to shareholder democracy exists; nor is a legal right of Publicis threatened, by granting the injunction requested by True North.

In contrast, the failure to issue an injunction clearly will lead to irreparable harm to True North. True North's bargained for contractual right to make acquisitions with the support of Publicis (and at the very least, without hostile overtures by Publicis), will certainly be lost, and its opportunity to merge with Bozell may be lost. Therefore, I find that the balance of equities tips heavily in favor of True North and against Publicis.

As True North has met its burden, I grant its motion for a preliminary injunction.[1]

IT IS SO ORDERED.

---

1. After Publicis' unsuccessful appeal to the Delaware Supreme Court, True North's shareholders on December 30, 1997, voted to approve the proposed merger with Bozell, by which 0.51 shares of True North will be swapped for each Bozell share. *See The Wall Street Journal* A3 (Dec. 31, 1997).