# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE INVESTORS BANCORP, INC. | : | **Consolidated** |
| STOCKHOLDER LITIGATION | : | **C.A. No. 12327-VCS** |

## MEMORANDUM OPINION

Date Submitted: January 5, 2017
Date Decided: April 5, 2017

David A. Jenkins, Esquire, Neal C. Belgam, Esquire, and Clarissa R. Chenoweth, Esquire of Smith Katzenstein & Jenkins LLP, Wilmington, Delaware, and Steven J. Purcell, Esquire, Douglas E. Julie, Esquire, and Robert H. Lefkowitz, Esquire of Purcell Julie & Lefkowitz LLP, New York, New York, Attorneys for Plaintiffs.

Kenneth J. Nachbar, Esquire and Zi-Xiang Shen, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware, Attorneys for Defendants.

**SLIGHTS, Vice Chancellor**

A mutual holding company that owned more than half of the stock of a bank subsidiary completed a mutual-to-stock conversion to become a fully public stock holding company. Following the conversion, the directors adopted an equity compensation plan and submitted it to the stockholders for approval. After receiving stockholder approval, the directors granted themselves substantial restricted stock and stock options under the plan. When word of the equity awards became public, stockholders initiated this derivative action alleging that the compensation awards were excessive and unfair to the corporation.

The key issue in this case is whether the stockholder approval of the equity compensation plan extends to the board of directors' subsequent decision to authorize grants of awards under the plan such that the propriety of these awards should be reviewed under a waste standard. Always recognizing that these are inherently self-dealing transactions, this court has nonetheless considered challenges to board-level and executive compensation awards under different standards of review depending upon the specific details and parameters of the plan previously submitted for stockholder approval. In some instances, the court has determined that any purported limit on the total amount of equity compensation allowed under a plan approved by stockholders was, in fact, no limit at all. In these cases, this court has refused to deem approval of the overall plan as approval of any awards directors might give themselves under its terms and has reviewed the awards under the entire

1

fairness standard of review. In other instances, this court has concluded that the action of the directors fell within limits specifically imposed by the terms of the plan that had been approved by stockholders. Under these circumstances, this court deems the stockholder approval of the plan to be ratification of awards made under the plan and reviews the awards for waste.

In this case, both non-employee directors and executive directors were granted equity awards under a stockholder-approved plan. Critically, this plan included director-specific limits that differed from the limits that applied to awards to other beneficiaries under the plan. Based on settled guidance in this area, particularly *In re 3COM Corp. S'holders Litig.* and *Calma on Behalf of Citrix Systems*, *Inc. v. Templeton* ("*Citrix*"),[1] I conclude that the fully informed stockholder vote that approved the plan extended to the awards themselves, which indisputably fell within the limits set by the plan. Accordingly, the propriety of these awards will be reviewed under the business judgment rule which defaults to a waste standard. Plaintiffs have not pled waste. I also conclude that Plaintiffs have not satisfied the test for demand futility under Court of Chancery Rule 23.1 with respect to their claim challenging the grant of awards to the executive directors. Finally, I have determined that Plaintiffs' unjust enrichment claim is merely a recast of their breach of fiduciary

---

[1] 1999 WL 1009210 (Del. Ch. Oct. 25, 1999); 114 A.3d 563 (Del. Ch. 2015).

2

duty claim and that they have failed to state a viable claim under either theory of recovery. Therefore, the motion to dismiss must be granted.

## I. BACKGROUND

The facts are drawn from allegations in the Complaint, documents integral to the Complaint and matters of which the Court may take judicial notice.[2] As it must at this stage of the proceedings, the Court assumes as true all well-pled facts in the Complaint.[3]

---

[2] *In re Crimson Exploration Inc. S'holder Litig.*, 2014 WL 5449419, at *8 (Del. Ch. Oct. 24, 2014) ("'A judge may consider documents outside of the pleadings only when: (1) the document is integral to a plaintiff's claim and incorporated in the complaint or (2) the document is not being relied upon to prove the truth of its contents.' Under at least the first exception, [the court finds] that consideration of the Proxy Statement is appropriate in resolving this dispute.") (citation omitted); *In re Gardner Denver, Inc.*, 2014 WL 715705, at *2 (Del. Ch. Feb. 21, 2014) (on a motion to dismiss, the Court may rely on documents extraneous to a complaint "when the document, or a portion thereof, is an adjudicative fact subject to judicial notice.") (footnotes and internal quotation marks omitted); *Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *5 (Del. Ch. Dec. 22, 2010) (same).

[3] Plaintiffs availed themselves of 8 *Del. C.* § 220 and secured books and records prior to filing their complaint. They have incorporated some of the fruits of this endeavor into their pleading. *See Rales v. Blasband*, 634 A.2d 927, 934–35 (Del. 1993) (noting the importance of utilizing the "tools at hand," including books and records demands, to investigate derivative complaints in order to overcome the pleading burdens imposed by Court of Chancery Rule 23.1); *King v. VeriFone Hldgs., Inc.*, 994 A.2d 354, 356 (Del. Ch. 2010), *rev'd on other grounds*, 12 A.3d 1140 (Del. 2011) ("For years, our Supreme Court has made clear that derivative plaintiffs should seek books and records and otherwise conduct an adequate investigation into demand excusal *before* rushing off to file a derivative complaint.").

**A. The Parties**

Plaintiffs, Robert Elburn and Dieter Soehnel, are and have continuously been stockholders of Investors Bancorp, Inc. ("Investors Bancorp" or the "Company") since May 7, 2014. Both stockholders acquired their shares in the Company's second-step offering described in detail below.

Defendants, Robert C. Albanese, Dennis M. Bone, Doreen R. Byrnes, Robert M. Cashill, William V. Cosgrove, Brian D. Dittenhafer, Brendan J. Dugan, James J. Garibaldi, Michele N. Siekerka and James H. Ward III are the ten non-employee directors that sit on the Company's twelve-member board of directors (the "Non-Employee Director Defendants"). Defendants, Kevin Cummings, the Company's President and CEO, and Domenick A. Cama, the Company's COO and Senior Executive Vice President, are the two executive officers that serve on the Company's board (the "Executive Director Defendants").

Nominal Defendant, Investors Bancorp, is a Delaware corporation with its principal place of business in Short Hills, New Jersey. The Company is a holding company for Investors Bank, a New Jersey chartered savings bank that has its corporate headquarters in Short Hills, New Jersey and operates 143 branches located throughout New Jersey and New York.

4

**B. Investors Bancorp Transitions to a Public Stock Holding Company Through a "Second-Step" Conversion**

Before the Company transitioned into its current capital structure, its predecessor, also called Investors Bancorp, Inc. ("Old Investors Bancorp"), completed an initial public offering in 2005. Through the initial public offering, Old Investors Bancorp offered 43.74% of its outstanding common stock for sale to public investors. After the public offering, Investors Bancorp, MHC, which was the mutual holding company parent of Old Investors Bancorp, held 54.94% of the outstanding common stock. The new Investors Bancorp was created in December 2013 in order for Old Investors Bancorp, Investors Bancorp, MHC and Investors Bank to undertake a Plan of Conversion and Reorganization (the "Conversion Plan"). Pursuant to the Conversion Plan, Investors Bancorp, MHC would cease to exist following the completion of a "second-step" conversion. Investors Bank would then reorganize from its two-tier mutual holding company structure into a fully public stock holding company structure (the "Mutual-to-Stock Conversion") and thereafter would become a wholly-owned subsidiary of a state-chartered stock corporation, Investors Bancorp (the "second step" of the conversion).

As part of the Conversion Plan, the shares of Old Investors Bancorp already held by the public were converted to shares of common stock of Investors Bancorp pursuant to an exchange ratio designed to preserve percentage ownership interests. The shares previously held by Investors Bancorp, MHC were sold to the public at

$10.00 per share. Through this second-step offering, the Company sold 219,580,695 shares and raised net proceeds of $2.15 billion. The Conversion Plan was completed in May 2014.

### C. 2014 Director Compensation

The Company's board of directors (the "Board") sets director compensation based on recommendations of the Compensation and Benefits Committee (the "Compensation Committee"). The Compensation Committee's membership includes a majority of the Board with seven out of the ten non-employee directors serving on the committee. At issue in this case are equity awards approved by the Board as compensation for both non-employee and executive directors.

#### 1. Non-employee Directors

In 2014, non-employee directors were awarded three different strains of compensation: (i) a monthly cash retainer for board service; (ii) additional cash rewards for attending board and board committee meetings; and (iii) perquisites and other personal benefits. The Chairman of each committee received an additional annual retainer. As the following chart depicts, annual compensation for all non-employee directors ranged from $97,200 to $207,005, with $133,340 as the average amount of compensation per director.

| Name | Investors Bancorp Cash Fees | Bank Cash Fees | All Other Compensation | Total |
|---|---|---|---|---|
| Albanese | $56,500 | $73,200 | $343 | $130,043 |
| Bone | $37,500 | $73,200 | $264 | $110,964 |
| Byrnes | $59,500 | $73,200 | $9,898 | $142,598 |
| Cashill | $48,000 | $146,400 | $12,605 | $207,005 |
| Cosgrove | $24,000 | $73,200 | $32,970 | $130,170 |
| Dittenhafer | $59,500 | $73,200 | $13,392 | $146,092 |
| Dugan | $45,000 | $73,200 | - | $118,200 |
| Garibaldi | $24,000 | $73,200 | - | $97,200 |
| Siekerka | $45,000 | $73,200 | $230 | $118,430 |
| Ward | $59,500 | $73,200 | - | $132,700 |

## 2. Executive Directors

As of 2014, Cummings, the Company's President and CEO, received the following compensation: (i) a base salary of $1,000,000; (ii) an Annual Cash Incentive Award of up to 150% of his base salary contingent on certain performance goals; and (iii) perquisites and other benefits valued at $278,400. In total, his annual compensation package was valued at $2,778,700. For Cama, the Company's COO and Senior Executive Vice President, annual compensation consisted of: (i) a base salary of $675,000; (ii) an Annual Cash Incentive Award of up to 120% of his base

salary; and (iii) perquisites and other benefits valued at $180,794. In total, his 2014 compensation was valued at $1,665,794.

## D. The Adoption of the Equity Incentive Plan

The Compensation Committee held a meeting on December 15, 2014, approximately seven months following the completion of the Conversion Plan, to review 2014 director compensation and to set compensation for 2015. At the meeting, a compensation consultant from GK Partners, Inc., Gregory Keshishian, presented a study analyzing the director compensation within eighteen publicly held companies that the Compensation Committee had previously identified as peers. The study revealed that, on average, these companies paid their non-employee directors $157,350 in total compensation. The Company's average non-employee director compensation of $133,340 in 2014 was in line with this figure. Following the presentation, the Compensation Committee recommended to the Board that the non-employee director compensation package remain the same for 2015. The only change was to increase the fees paid for attending committee meetings from $1,500 to $2,500.

The Compensation Committee discussed the compensation package for executive officers at the same meeting. After reviewing and discussing GK Partners' compensation study with respect to average compensation paid to executive officers, the Compensation Committee unanimously recommended to the Board that

Cummings' annual salary remain at $1,000,000, but that his 2015 Annual Cash Incentive Award be increased from 150% to 200% of his base salary. The Board retained Cama's base salary at its 2014 level, but raised his 2015 Annual Cash Incentive Award from 120% to 160% of his base salary.

The only items left to be determined were the precise metrics that would apply to the incentive awards. Those metrics were set at the next meeting of the Compensation Committee on February 23, 2015. The meeting minutes do not reflect any discussion of additional awards for directors in 2015.

On March 24, 2015, the Board revisited director compensation and ultimately adopted the 2015 Equity Incentive Plan at issue in this litigation (the "EIP") to be administered by the Compensation Committee. Under the EIP, 30,881,296 shares of the Company's common stock are reserved for restricted stock awards, restricted stock units, incentive stock options, and non-qualified stock options for the Company's officers, employees, non-employee directors, and service providers. The EIP imposes limits on: (i) the number of shares the Company can issue as stock options (a maximum of 17,646,455) or as restricted stock awards, restricted stock units or performance shares (a maximum of 13,234,841), and (ii) the number of shares the Company can award to employees and directors. Specifically, the EIP imposes the following ceilings on awards to employees and non-employee directors:

9

- A maximum of 4,411,613 shares, in the aggregate (25% of the shares available for stock option awards), may be issued or delivered to any one employee pursuant to the exercise of stock options;

- A maximum of 3,308,710 shares, in the aggregate (25% of the shares available for restricted stock awards and restricted stock units), may be issued or delivered to any one employee as a restricted stock or restricted stock unit grant; and

- The maximum number of shares that may be issued or delivered to all non-employee directors, in the aggregate, pursuant to the exercise of stock options or grants of restricted stock or restricted stock units shall be 30% of all option or restricted stock shares available for awards, "all of which may be granted in any calendar year."[4]

According to the Proxy filed on April 30, 2015, the EIP was meant to "provide additional incentives for [the Company's] officers, employees and directors to promote [the Company's] growth and performance and to further align their interests with those of [the Company's] stockholders."[5] The Proxy also disclosed that "[t]he number, types and terms of awards to be made pursuant to the [EIP] are subject to the discretion of the [Compensation] Committee and have not been determined at this time, and will not be determined until subsequent to stockholder approval."[6] The EIP was put to a stockholder vote on June 9, 2015, at the Company's 2015

---

[4] Transmittal Aff. of Zi-Xiang Shen in Supp. of Br. in Supp. of Defs.' Mot. to Dismiss Ex. 2, DEF 14A Proxy Statement ("Proxy") at 40; Proxy Appendix A, 2015 Equity Incentive Plan § 3.3.

[5] Proxy at 40.

[6] Proxy at 46.

Annual Meeting.  Of the shares voted at the meeting, 96.25% voted to approve the EIP (representing 79.1% of the total shares outstanding).

### E. 2015 Director Compensation

Beginning on June 12, 2015, three days after the stockholder vote to approve the EIP, the Compensation Committee held four meetings that ultimately resulted in the approval of awards of restricted stock and stock options to all Board members. The minutes of the first meeting on June 12 state that the objective of the meeting was to "begin the process of determining the allocation of shares" to be granted under the EIP.  At the next meeting, on June 16, the Board received input from various experts, including a presentation by outside counsel, Luse Gorman, PC.  The materials for this presentation included a chart of 164 companies that had undergone a mutual-to-stock conversion in the past twenty years with a list of the number of stock options and stock awards that each company had distributed to its directors and executive officers upon completion of the conversion.

The Compensation Committee met next on June 19.  At this meeting, the Compensation Committee focused on the language in the EIP that authorized up to 30% of the EIP's capacity to be granted to non-employee directors.  At some point in the meeting, Cama proposed a number of restricted stock and stock options to be awarded to himself and Cummings.  Thereafter, the Compensation Committee polled each member for a reaction to Cama's proposal and each "responded in the

11

affirmative." At the end of the meeting, the Compensation Committee held an executive session (without Cama and Cummings) during which "[a]ll members of the Committee reaffirmed their sentiment of where they came out in the open session" with respect to the awards to be granted to Cama and Cummings. A few days later, on June 23, the Board approved an award of stock options and restricted stock for each of the twelve Board members. In total, the grant date fair value of the awards for all twelve Board members was approximately $51.5 million, broken down by member as follows:

| Name | Restricted Stock | Stock Options | Total |
|------|------------------|---------------|-------|
| Albanese | $1,254,000 | $780,000 | $2,034,000 |
| Bone | $1,254,000 | $780,000 | $2,034,000 |
| Byrnes | $1,254,000 | $780,000 | $2,034,000 |
| Cashill | $1,881,000 | $780,000 | $2,661,000 |
| Cosgrove | $1,254,000 | $780,000 | $2,034,000 |
| Dittenhafer | $1,881,000 | $780,000 | $2,661,000 |
| Dugan | $1,254,000 | $780,000 | $2,034,000 |
| Garibaldi | $1,254,000 | $780,000 | $2,034,000 |
| Siekerka | $1,254,000 | $780,000 | $2,034,000 |
| Ward | $1,254,000 | $780,000 | $2,034,000 |

| | | | |
|---|---|---|---|
| Cummings | $12,540,000 | $4,159,999 | $16,699,999 |
| Cama | $10,032,000 | $3,327,998 | $13,359,998 |

## F. Procedural History

Following the Company's announcement of the equity awards in a Schedule 14A Proxy Statement issued on April 14, 2016, three separate complaints were filed in this Court alleging that the directors had breached their fiduciary duties by awarding themselves grossly excessive compensation. Following the Court's entry of an order appointing co-lead Plaintiffs and co-lead counsel, Defendants filed a motion to dismiss the Verified Stockholder Derivative Complaint (the "Compl.") under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted and under Court of Chancery Rule 23.1 for failure to make a pre-suit demand with respect to the grants of equity compensation to the executive directors.

## II.    ANALYSIS

As noted, the key issue with respect to Defendants' Rule 12(b)(6) motion is whether the stockholder approval of the EIP will be deemed ratification of the awards made under the plan. If so, then the awards to all directors will be reviewed for waste. In the alternative, Defendants argue that the Plaintiffs' failure to make a demand on the Board with respect to the awards to the Executive Director Defendants cannot be excused and requires dismissal of the Complaint under Rule 23.1 with respect to those awards. I first address Defendants' argument that

13

the Complaint should be dismissed for failure to state a claim against all Defendants and then turn to whether demand on the Board was excused with respect to the specific grants of equity compensation to the Executive Director Defendants.

## A. Motion to Dismiss Standard

"The standards governing a motion to dismiss for failure to state a claim are well settled: (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are 'well-pleaded' if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the 'plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.'"[7]

## B. Stockholder Ratification of the EIP Awards

Every member of the Board, including the seven members of the Compensation Committee, received awards. "[D]irector self-compensation decisions are conflicted transactions that 'lie outside the business judgment rule's presumptive protection, so that, where properly challenged, the receipt of self-determined benefits is subject to an affirmative showing that the compensation

---

[7] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (citations omitted).

arrangements are fair to the corporation.'"[8]  Since the Board approved the grant of equity awards to themselves, entire fairness is the default standard of review.[9]  To avoid entire fairness review, Defendants raise the affirmative defense of stockholder ratification.  If they are correct that this defense is evident in the well-pled allegations of the Complaint, then the Court must review the awards under the business judgment rule standard.[10]

Plaintiffs contend that ratification cannot apply here for three reasons.  *First*, the stockholders could not ratify the awards since the EIP approved by stockholders did not authorize self-executing payments of compensation nor did it contain "meaningful limits" on the amount of awards the Board members could grant themselves.  *Second*, even if the plan lacked meaningful limits, the Defendants could

---

[8] *Calma on Behalf of Citrix Sys., Inc. v. Templeton*, 114 A.3d 563, 578 (Del. Ch. 2015) ("*Citrix*") (quoting *Telxon Corp. v. Meyerson*, 802 A.2d 257, 265 (Del. 2002)).

[9] Defendants sensibly make no argument that demand is not excused with respect to the grants of equity options the Non-Employee Director Defendants approved for themselves.  This position is well-grounded because "the law is skeptical that an individual can fairly and impartially consider whether to have the corporation initiate litigation challenging his or her own compensation, regardless of whether or not that compensation is material on a personal level." *Citrix*, 114 A.3d at 576 (citation omitted).

[10] *Cambridge Ret. Sys. v. Bosnjak*, 2014 WL 2930869, at *9 (Del. Ch. June 26, 2014) ("Because plaintiff has failed to undermine the validity of the stockholders approvals on which the equity awards in question were expressly conditioned, the business judgment rule applies to the board's decision to grant those awards in the first instance.  [W]here business judgment presumptions are applicable, the board's decision will be upheld unless it cannot be attributed to any rational business purpose.") (citations and internal quotation marks omitted).

have sought ratification by asking stockholders to approve the specific grants, but declined to do so. *Third*, Defendants cannot invoke ratification when they failed to disclose all material facts regarding the EIP when seeking stockholder approval of the plan. For the sake of efficiency and clarity, I will consider Plaintiffs' first two arguments together before addressing their argument regarding the lack of a fully informed stockholder vote. If the Board lacked authority to approve the awards or the limits in the EIP lacked the requisite level of specificity, then ratification is unavailable regardless of whether the vote was fully informed.

### 1. Are the Equity Awards Ratifiable?

Chancellor Allen addressed the effect of "ratification" by a stockholder vote on the review of an equity compensation plan in *Lewis v. Vogelstein*.[11] He noted that the doctrine of ratification is animated by "principles [that are] broader than those of corporation law"; it derives from the recognition in agency law that a principal may confer upon the agent authority to act "in circumstances in which the agent had no authority or arguably had no authority."[12] He then confirmed that the

---

[11] 699 A.2d 327 (Del. Ch. 1997).

[12] *Id.* at 334. I note, as some other members of the court have observed, that the term "ratification" does not fit perfectly in this context because "[r]atification in the usual sense, involves shareholders affirmatively sanctioning earlier board action, the effect of which is to validate the action" and agree that the term "advance ratification" is somewhat "oxymoronic." *In re 3COM S'holders Litig.*, 1999 WL 1009210, at *3 (Del. Ch. Oct. 25, 1999). Nevertheless, "for lack of a better nomenclature and in the interest of simplicity," I use the term ratification throughout this opinion to describe the concept of advanced

doctrine would apply when stockholders give their informed approval of officer or director option grants, even though the transactions are inherently self-interested, and that stockholder ratification will result in "protect[ion] [of] the transaction from judicial review except on the basis of waste."[13]

Plaintiffs agree that a fiduciary "can avoid entire fairness review of a self-dealing transaction by demonstrating that the transaction has been ratified by a fully informed and uncoerced vote of a majority of disinterested stockholders, in which case business judgement will apply and plaintiff must meet the standard for pleading a waste claim."[14] They argue, however, that the awards at issue here were not ratified because the specific parameters of the EIP were such that no award of equity compensation under the EIP could have been approved by stockholders in advance. In other words, according to the Plaintiffs, the awards at issue here were not ratifiable because the Board failed to seek stockholder approval for the specific awards made under the plan. To support this position, Plaintiffs characterize the EIP as an "omnibus stock plan" and contend that Defendants are relying upon an argument that this court repeatedly has rejected; specifically, that director decisions on

---

stockholder approval of awards made under a previously approved plan. *Citrix*, 114 A.3d at 579 n. 63.

[13] *Lewis v. Vogelstein*, 699 A.2d 327, 336 (Del. Ch. 1997).

[14] Pls.' Opp'n to Defs.' Mot. to Dismiss Pls.' Compl. ("Answering Br.") 25.

17

compensation are entitled to business judgment rule deference as long as the awards do not violate a stockholder-approved plan, regardless of its lack of specific limits.

This court recently performed an exhaustive review of the law of stockholder ratification with regard to director equity compensation in *Citrix*. There, Chancellor Bouchard analyzed in detail "how shareholder approval has been treated for 60 years, both by the Supreme Court and the Chancery Court."[15] *Citrix* is rich with helpful guidance in this area of our law, but the most salient, given the facts of this case, is the effect that "director-specific" limits within a stockholder-approved equity compensation plan will have on the efficacy and reach of stockholder approval. The court noted that there is a distinction between stockholder approval of a plan that features broad parameters and "generic" limits applicable to all plan beneficiaries on the one hand and, on the other hand, a plan that sets "specific limits on the compensation of the particular class of beneficiaries in question."[16] Approval of broader plans will not extend to subsequent grants of awards made pursuant to that plan; approval of plans with "specific limits," however, will be deemed as ratification of awards that are consistent with those limits.[17]

---

[15] *Citrix*, 114 A.3d at 578 (internal citation omitted).

[16] *Id.* at 587.

[17] *Compare Sample v. Morgan*, 914 A.2d 647, 663–64 (Del. Ch. 2007) (holding that "the mere approval by stockholders of a request by directors for the authority to take action within broad parameters does not insulate all future action by the directors within those parameters from attack") *with 3COM*, 1999 WL 1009210, at *3 n.9 (noting that "the

In *Citrix*, the court concluded "that the defendants have not established that Citrix stockholders ratified the RSU Awards because, in obtaining omnibus approval of a Plan covering multiple and varied classes of beneficiaries, the Company did not seek or obtain stockholder approval of any action *bearing specifically on the magnitude of compensation to be paid to its non-employee directors*."[18] In reaching this conclusion, the court relied heavily, by way of distinction, upon *3COM*. There, the plaintiffs challenged what they believed to be "excessive" and "lavish" options granted to the company's directors under a stockholder-approved plan.[19] The court ultimately concluded that the stockholders had approved the grants at issue because the stockholders had approved a director stock option plan with director-specific ceilings. Specifically, the court observed that the "board issued options to directors in amounts *within the specific ceilings* set forth in the plan as approved by 3COM stockholders," a point which the court in *Citrix* described as "critical to the Court's

_____

strictures of this plan include . . . specific ceilings on the awarding of options each year . . . . [and] it is implicit that the Board may only exercise discretion within these parameters and is free to award as many options as the Plan permits or as few as zero options," and holding that "[o]ne cannot plausibly contend that the directors structured and implemented a self-interested transaction inconsistent with the interests of the corporation and its shareholders when the shareholders knowingly set the parameters of the Plan, approved it in advance, and the directors implemented the Plan according to its terms.").

[18] *Citrix*, 114 A.3d at 569 (emphasis in original).

[19] *3COM*, 1999 WL 1009210, at *1.

analysis."[20]  Indeed, in summarizing *3COM*'s holding, *Citrix* explained that "[t]he rationale of the Court's conclusion in *3COM* is that it would have made little sense to have required the *3COM* directors to establish the entire fairness of their compensation when the directors exercised their business judgment to grant options in amounts within the director-specific ceilings previously approved by stockholders."[21]

Plaintiffs seek to distinguish *3COM* on two grounds.  First, they emphasize that the plan at issue in *3COM* applied only to directors and not company executives or other beneficiaries.  Second, they argue that the *3COM* plan defined its terms and limits in such detail that the court there had no difficulty concluding that the stockholder vote to approve the plan was tantamount to approval in advance of any grants that were within the parameters of the plan.  Essentially, Plaintiffs argue that the only circumstances in which a stockholder vote can ratify in advance a board of directors' decision to approve equity awards to its members is when the "plan [is] either completely self-executing in that it provide[s] for fixed amounts of pay or [] specifically impose[s] meaningful limits on the directors' ability to compensate themselves."[22]  According to Plaintiffs, only then will it be clear that there has been

---

[20] *Citrix*, 114 A.3d at 582 (emphasis in original).

[21] *Id.*

[22] Answering Br. 34.

20

"a meeting of the minds" between the board and stockholders as to precisely what the stockholders have approved.[23]

Plaintiffs' attempt to distinguish *3COM* falls short. It is true that the plan at issue in *3COM* singled-out director beneficiaries.[24] What Plaintiffs fail to explain, however, and what I cannot discern, is how, in the ratification context, stockholder approval of a director-only option plan, that includes specific limits for those directors, differs in any meaningful respect from a company-wide plan that includes director-specific limits for all director beneficiaries as a component of the plan. In either case, the key point is the specific focus on the limit or limits imposed on awards to various beneficiaries of the plan, particularly, in this case, non-employee and executive directors. The EIP contained such limits.

Plaintiffs are also wrong when they argue that the plan in *3COM* is significantly more specific than the EIP. The plan in *3COM* did, as Plaintiffs observe, set annual ceilings that differed based on different types of board service. This is in contrast to the specific ceilings in the EIP that apply to all non-employee directors equally as well as the specific ceilings that apply to all executive directors

---

[23] Answering Br. 40–41 (citing *Larkin v. O'Connor*, C.A. No. 11338-CB, at 69–71 (Del. Ch. Mar. 22, 2016) (TRANSCRIPT)).

[24] *3COM*, 1999 WL 1009210, at *1 (noting that "Plaintiff's claims flow from 3COM stock options granted to members of the board under the company's Director Stock Option Plan . . .").

21

equally. Here again, however, the Plaintiffs point to a distinction without a difference. Once the plan sets forth a specific limit on the total amount of options that may be granted under the plan to all directors, whether individually or collectively, it has specified the "director-specific ceilings" that *Citrix* found to be essential when determining whether stockholders also approved in advance the specific awards that were subsequently made under the plan.[25]

Contrary to the characterization of the EIP offered by Plaintiffs, I am satisfied that the plan set "specific limits on the compensation of" the non-employee and

---

[25] *See Citrix*, 114 A.3d at 586 ("There was also valid stockholder approval of the compensation awarded to directors in *3COM* . . . because the awards at issue were within the director-specific ceilings of *3COM* . . ."); *Criden v. Steinberg*, 2000 WL 354390 (Del. Ch. Mar. 23, 2000) (granting motion to dismiss plaintiff's challenge to the defendants' issuance of re-priced employee stock options pursuant to a stockholder-approved stock option plan upon concluding that "the directors merely implemented a plan presumably entirely consistent with the interests of the corporation and its shareholders because the shareholders knowingly endorsed the parameters of the plan."). Plaintiffs point to *Larkin v. O'Connor*, C.A. No. 11338-CB, at 69–71 (Del. Ch. Mar. 22, 2016) (TRANSCRIPT) as an example of where this court has denied a motion to dismiss because the terms of the equity plan and the proposal stockholders ultimately approved with respect to director equity awards were not sufficiently clear to allow the court to draw a pleadings-stage inference that the stockholders had ratified equity awards that were subsequently made to the directors. *Larkin* is also distinguishable. There, the board presented stockholders with a confusing, inverted proposal and then asked them to approve two separate corporate actions (the plan and the awards) in one single vote. The court determined, under these circumstances, that there was some question as to whether a "meeting of the minds" was reached between the board and stockholders. No such confusion exists here. Investors Bancorp stockholders were asked to approve a plan with specific director limits baked into it. In approving the plan, they were necessarily approving the limits as part of the plan. This is exactly what the stockholders in *3COM* did when they voted to approve a plan that included specific limits.

22

executive members of the Board such that the stockholders' approval of the EIP reflects their ratification of all of the specific awards later approved by the Board.[26] This is not a situation where, in seeking approval of the EIP, the Board sought "blank check" authority for subsequent awards.[27] The EIP contained meaningful, specific limits on awards to all director beneficiaries. Stockholders were informed that the total available number of restricted shares was 13,234,841, representing 6% of the total number of shares sold pursuant to the Conversion Plan, and that the total number of stock option shares was 17,646,455, representing 8% of that amount.

---

[26] *Citrix*, 114 A.3d at 587. To be sure, awards under the EIP were not self-executing in the sense that the plan did not identify the specific amounts of the awards or the specific times at which they would be granted at the time the stockholders approved the plan. If the awards were self-executing, there would be no room to dispute that subsequent awards would be subject to business judgment review. *Id.* at 581 (discussing *Steiner v. Meyerson*, 1995 WL 441999 (Del. Ch. July 19, 1995) (holding that "stockholder approval of the plan [with self-executing awards] *per force* meant stockholder approval of the option awards for which the directors asserted a ratification defense.") But this is not the only basis under our law upon which a defendant may seek to avoid the scrutiny of entire fairness. Plaintiffs acknowledge this, as they must, given *3COM*. *3COM*, 1999 WL 1009210, at *3 n.9 ("The strictures of this plan include (at minimum) specific ceilings on the awarding of options each year . . . . [and] it is implicit that the Board may only exercise discretion within these parameters and is free to award as many options as the Plan permits or as few as zero options.") As explained in *Citrix*, if the plan contains "specific limits on the compensation of the particular class of beneficiaries in question," *Citrix*, 114 A.3d at 587, then awards made after stockholders approve the plan that are within the "specific limits" will likewise be deemed approved, or ratified, by the stockholders. *Id.* at 582 ("The rationale of the Court's conclusion in *3COM* is that it would have made little sense to have required the 3COM directors to establish the fairness of their compensation when the directors exercised their business judgement to grant options in amounts within the director-specific ceilings previously approved by stockholders.").

[27] *Citrix*, 114 A.3d at 585.

23

They were also advised of the magnitude of the awards Board members could award to themselves under the EIP. Specifically, the EIP expressly stated that "[t]he maximum number of shares of Stock that may be covered by Awards granted to all non-Employee Directors, in the aggregate, is thirty percent (30%) of the shares authorized under the Plan all of which may be granted during any calendar year."[28] The EIP also stated that "[t]he maximum number of shares of Stock that may be subject to stock options to any one Participant who is an employee covered by Code Section 162(m) during any calendar year . . . shall be 4,411,613 shares" and that "[t]he maximum number of shares of Stock that may be subject to Restricted Stock Awards or Restricted Stock Units which are granted to any one Participant who is an employee covered by Code Section 162(m) during any calendar year . . . shall be 3,308,710 shares, all of which may be granted during any calendar year."[29] These limits are unlike the "generic" limit for all beneficiaries under the equity compensation plan in *Citrix,* which was 1 million shares with "no sub-limits varied

---

[28] EIP § 3.3(c).

[29] The Proxy, in several sections, gave stockholders additional information regarding the precise meaning of an "employee covered by Code Section 162(m)." For example, the Proxy explained that "Code Section 162(m) generally limits our ability to deduct for tax purposes compensation in excess of $1 million per year for each of our chief executive officer and four other executive officers named in our annual proxy statement named in the summary compensation table ("covered employees")." Proxy at 45. Therefore, stockholders were given the information necessary to understand that employees covered by Code Section 162(m) were the Company's five executive employees named in the summary compensation table, including Cama and Cummings.

by position with the Company, such as a limit for non-employee directors and a different limit for officers."[30] This is also distinguishable from *Sample v. Morgan*,[31] where the company's management stock incentive plan authorized up to 200,000 shares to be issued, but had no internal limits as to how many shares could be issued to individuals.[32] In this case, stockholders approved specific limits and the directors

---

[30] *Citrix*, 114 A.3d at 570.

[31] 914 A.2d 647 (Del. Ch. 2007).

[32] *Id.* at 650. In *Sample,* following the stockholder vote, a compensation committee met for just 25 minutes to consider a proposal to grant all 200,000 shares (which represented 37.1% of the company's voting power) to just three employees. The proposal was adopted ten days later during a twenty-minute meeting. The court in *Citrix,* addressing *Sample*, observed: "[t]he key point I take away from this analysis is that because the stockholders in *Sample* merely voted in favor of the broad parameters of the plan—and had not voted in favor of any specific awards under the plan—the defendants could not show that stockholders had ratified the decision to grant all of the 200,000 shares authorized under the plan to just the three employee directors. Thus, the directors' conduct would be reviewed under ordinary principles of fiduciary duty and not limited to a waste standard." *Citrix*, 114 A.3d at 584. This explains why the court in *Sample* concluded that the stockholder vote in that context was "best understood as a decision by stockholders to give the directors broad legal authority and to rely upon the policing of equity to ensure that the authority would be utilized properly." *Sample*, 914 A.2d at 664.

then approved awards within the bounds of these limits.[33] Accordingly, their decision must be reviewed for waste. And Plaintiffs have not pled waste.[34]

---

[33] One cannot help but acknowledge that the awards here were quite large. Indeed, Plaintiffs make allegations, which appear well-founded, that the Defendants knew that the compensation they were awarding to themselves was well above the level of compensation of directors at other corporations in the Company's self-identified peer group. This fact alone, however, is not sufficient to subject the awards to entire fairness review. That the awards were large does not mean that stockholders could not approve the amounts in advance through a fully informed stockholder vote. As our Supreme Court has explained, "the long-standing policy of our law has been to avoid the uncertainties and costs of judicial second-guessing when the disinterested stockholders have had the free and informed chance to decide on the economic merits of a transaction for themselves." *Corwin v. KKR Financial Hldgs. LLC*, 125 A.3d 304, 312–313 (Del. 2015). Of course, facts could arise in which the awards to directors are so extraordinary that the court could conclude that it was reasonably conceivable the plaintiff(s) had stated a claim for waste. As this court has explained, "the doctrine of waste is a residual protection for stockholders which polices the outer boundaries of the broad field of discretion afforded directors by the business judgment rule." *Sample*, 914 A.2d at 669. *But see*, *Singh v. Attenborough*, 137 A.3d 151, 151–52 (Del. 2016) ("When the business judgment rule standard of review is invoked because of a vote, dismissal is typically the result. That is because the vestigial waste exception has long had little real-world relevance, because it has been understood that stockholders would be unlikely to approve a transaction that is wasteful.") But, in the absence of a pled claim for waste, I decline to adopt the Plaintiffs' proffered "meaningful limits" test in which the court would assess whether the specific limits within an equity compensation plan were "meaningful" before determining whether the doctrine of ratification should apply. This test would propel the court into a position where it was second-guessing the informed decision of stockholders to approve compensation for the company's directors and officers. This is antithetical to settled Delaware law.

[34] I note that the Company's proxy materials clearly identify the rational business purpose of the EIP: "to attract, motivate and retain highly qualified officers, employees and directors by offering a competitive compensation program that is linked to the performance of our common stock." Proxy at 40.

## 2. Was the Stockholder Vote Fully Informed?

Plaintiffs argue that even if the awards were ratifiable in advance, the stockholder approval received through the vote on the EIP is insufficient to trigger ratification for the independent reason that the stockholders were not fully informed of all material facts before voting.[35]  Directors have a "fiduciary duty to disclose fully and fairly all material information within the board's control when [they] seek[] shareholder action."[36]  Information is material to stockholders when "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."[37]  Plaintiffs emphasize that "in order for directors to access the safe harbor of ratification, they must meet an affirmative 'burden of demonstrating full and fair disclosure.'"[38]

According to Plaintiffs, the Board undermined the vote when it "represented [to stockholders] that it adopted the [EIP] to serve as a compensation vehicle for all

---

[35] Plaintiffs have not pled a disclosure claim in their Complaint.  Their breach of fiduciary claim is only that "[e]ach Defendant breached his/her fiduciary duty of loyalty by granting and accepting compensation in amounts that were excessive and unfair to the Company." Compl. ¶ 134.  Nevertheless, it is appropriate to address the disclosure arguments in the context of Defendants' ratification defense.

[36] *Arnold v. Soc'y for Sav. Bancorp., Inc.*, 650 A.2d 1270, 1277 (1994) (internal citation omitted).

[37] *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

[38] *Sample*, 914 A.2d at 665.

of the Company's nearly 1,800 employees, officers, and non-employee directors for the purpose of giving Investors Bancorp the flexibility [it] need[s] to continue to attract, motivate and retain highly qualified officers, employees and directors by offering a competitive compensation program that is linked to the performance of [the Company's] common stock."[39]  This representation was deceiving, according to Plaintiffs, because the Proxy concealed that the Board "had timed the implementation of the [EIP] to avoid restrictions imposed by [Federal Reserve Board ("FRB")] rules, and that they were planning to use over 25% of the [EIP]'s capacity immediately after stockholder approval to make an 'allocation' of shares to themselves as a reward for a transaction that occurred more than a year earlier."[40] The Proxy's disclosure "that awards have not been determined at this time, and will not be determined until subsequent to stockholder approval," served only to exacerbate the deception.[41]

---

[39] Answering Br. 42 (internal citation omitted).

[40] *Id.*

[41] *Id.*  The parties disagree over whether the Court can consider the contents of a Prospectus that was issued in 2014, more than a year before stockholders were asked to approve the EIP.  Defendants argue that the Prospectus expressly told stockholders of the Company's plans to issue restricted stock and stock options in the future once an equity incentive plan had been adopted and approved.  I do not resolve this dispute, however, because I do not need to look beyond the four corners of the Proxy to determine that the stockholder vote here was fully informed.

Plaintiffs' characterization of the Proxy finds no support in the document itself or in Delaware law. They have either pointed to omissions that are not material as a matter of law or have selectively referred to portions of the Proxy without providing full context. In either event, they have failed to identify any bases upon which the Court could reasonably infer that the stockholders' approval of the EIP was uninformed.

*First*, with respect to Plaintiffs' contention that the Board withheld information about the timing of the implementation of the EIP in order to avoid FRB rules that limit how many shares can be allocated to the plan, this information is not material. The percentage of the Company's total shares that were set aside for the EIP was at the limit imposed by the FRB rules, not above it. Accordingly, the timing of the adoption of the EIP in relation to the FRB rules cannot be material. Moreover, the EIP was approved at the first meeting of stockholders to occur after the plan was adopted. Plaintiffs' argument that the timing was somehow manipulated conveniently ignores this fact. Under these circumstances, any disclosures regarding the FRB rules or the timing of the EIP would have been immaterial and probably confusing.

*Second*, it is not reasonably conceivable from the facts pled in the Complaint that the Board concealed from stockholders a preconceived plan to grant themselves equity awards under the EIP as soon as it was implemented. Specifically, the

Complaint acknowledges the lengthy process initiated by the Board after stockholder approval of the EIP but before the Board determined the specific awards that would be made to individual directors, including four formal meetings of the Compensation Committee where the Board received input regarding the awards from expert advisors.[42]  Plaintiffs have not alleged specific facts that the Board had agreed to make any specific awards prior to stockholder approval of the EIP or prior to undertaking the formal process of determining what awards should be made.  The fact that the Board met on the heels of the stockholders' approval of the EIP does not alone support a reasonable inference that the disclosures regarding the plan were a sham or that the Board was hiding its true intentions to stockholders all along.  The stockholders were apprised of the parameters of the EIP and knew that once it was implemented the Board could immediately begin discussing implementation within those parameters.

Plaintiffs point to *ODS Technologies, L.P. v. Marshall*[43] and argue that, like the board in that case, the Board here "g[ave] the impression that [the proposals] are

---

[42] Plaintiffs point out that all of the Compensation Committee meetings were attended by Board members who did not sit on the committee.  Specifically, at the June 12 meeting, Cummings and Cama were both in attendance.  At the June 16 meeting, the full Board, with the exception of Siekerka and Ward, attended.  On June 19, Cummings and Cama again joined the Compensation Committee meeting.  At the final meeting on June 23, the full Board was present.

[43] 832 A.2d 1254 (Del. Ch. 2003).

merely routine measures adopted on a clear day."[44]  The only "day" metaphor that is apt here is "night and day"—that is what *ODS* is to this case.  In *ODS*, the board attempted to thwart a would-be majority stockholder from gaining control by proposing bylaw amendments that would classify the board.  The disclosures in the proxy included some general information about classified boards but omitted the fact that the proposal was intended to fend off a specific threat.  For that reason, the court determined that stockholders had been misled about the true motivations for the proposal.[45]  Here, the EIP was approved by the Board in due course following the completion of the Conversion Plan and then submitted to stockholders for approval at the next scheduled annual meeting.  Based on the disclosures in the Proxy, the stockholders knew that once the EIP was approved, the Board could immediately choose to make awards, including to directors.  Given this background, *ODS* simply does not fit here.

************

Because the EIP (with director-specific limits) was approved by a fully informed stockholder vote and Plaintiffs have not pled a claim for waste, Plaintiffs

---

[44] Answering Br. 43 (quoting *Id.* at 1260).

[45] *ODS Technologies*, 832 A.2d at 1260 ("The Proxy Statement, however, fails to accurately depict the purposes or effects of the Amendments—purposes and effects the Board itself found relevant in its deliberations.").

have failed to plead a claim of breach of fiduciary duty against Defendants relating to subsequent awards issued under the EIP.[46] Therefore, Count I and Count II (unjust enrichment) of the Complaint must be dismissed.[47]

---

[46] The parties disagree over whether the claims against all Defendants can be dismissed on the Rule 12(b)(6) motion or whether dismissal of the claim for breach of fiduciary duty as it relates specifically to the grant of equity awards to the Executive Director Defendants requires an analysis of demand futility under Rule 23.1. *See* Br. in Supp. of Defs.' Mot. to Dismiss 19 ("The Court need not look beyond the Complaint's failure to state a claim for breach of fiduciary duty and unjust enrichment under Rule 12(b)(6)."); Answering Br. 49 n.18 ("On the other hand, while Defendants appear to contend that the awards to Cummings and Cama have also somehow been 'ratified' such that a Rule 12(b)(6) dismissal should result, they have not offered any explanation for that conclusion."). In my view, Plaintiffs' failure to state a claim for breach of fiduciary duty warrants dismissal of the Complaint as to all Defendants. I reach this conclusion based on the emphasis in both *3COM* and *Citrix* of the importance of "director-specific limits" and the implementation of a plan within those limits as predicates to finding ratification. In this case, Plaintiffs have challenged the awards to all of the director defendants (both the non-employee directors and the directors that also serve as executive officers). The EIP, however, included specific limits for both categories of directors based on their position within the Company. Stockholders, therefore, ratified not just a limit that applied only to one subset of directors, but specific limits broken down by each type of director serving on the Board. Therefore, I conclude that all awards to the director Defendants were ratified based on the "director-specific" limits applicable to each category. Even if I had not reached this conclusion, however, as discussed in detail below, Rule 23.1 provides an alternative basis upon which to dismiss the claims relating to Cama and Cummings.

[47] *Citrix*, 114 A.3d at 591 ("At the pleadings stage, an unjust enrichment claim that is entirely duplicative of a breach of fiduciary duty claim—*i.e.*, where both claims are premised on the same purported breach of fiduciary duty—is frequently treated in the same manner when resolving a motion to dismiss.") (citations and internal quotation marks omitted).

32

## C. Demand on the Board Is Not Excused For the Awards to Executive Officers

Defendants contend that Plaintiffs have not satisfied the test for demand futility with respect to the awards granted to the Executive Director Defendants. Accordingly, they argue that the claim against these defendants must be dismissed under Court of Chancery Rule 23.1. Plaintiffs counter that they have pled demand futility because "the awards received by Cummings and Cama were part of a premeditated unitary transaction with a single purpose: to allocate shares to executive and non-executive members of the Board, *i.e., a quid pro quo*."[48] In making this argument, Plaintiffs attempt to invoke a line of this court's cases which have held that, under certain circumstances, multiple transactions or proposals may be considered as a "single interrelated set of transactions, authorized as a *quid pro quo*" for purposes of determining demand futility.[49]

Under the test articulated in *Aronson v Lewis*,[50] the court determines demand futility by deciding whether, based on the particularized facts alleged in the complaint, "a reasonable doubt is created that: (1) the directors are disinterested and

---

[48] Answering Br. 49.

[49] *Needham v. Cruver*, 1993 WL 179336 (Del. Ch. May 12, 1993); *Noerr v. Greenwood*, 1997 WL 419633 (Del. Ch. July 16, 1997); *In re Nat'l Auto Credit, Inc. S'holders Litig.*, 2003 WL 139768, at *9 (Del. Ch. Jan. 10, 2003).

[50] 473 A.2d 805 (Del. 1984).

independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment."[51] Here, Plaintiffs argue that each director's disinterestedness and independence must be analyzed in light of the fact that the decision to approve the grant of awards to the non-employee directors was part of the same single, self-interested scheme to grant awards to the executive officers. Defendants disagree and point to the fact that the votes of the executive officers were not necessary for the approval of the grant of awards to the non-employee directors and, therefore, there could be no *quid pro quo*.

After carefully reviewing the Complaint, I am satisfied that Plaintiffs cannot invoke the *quid pro quo* theory on these facts. Even if the Plaintiffs did not have to demonstrate that the non-employee directors needed the votes of the executive officers for the approval of their own awards, they would still need to plead facts that allow a reasonable inference that the non-employee directors received *something* in return for their approval of the grants to the Executive Director Defendants before the Court could deem the two transactions as one self-interested scheme for purposes of demand futility.[52]

---

[51] *Id.* at 814. Because the entire board approved the awards, the *Aronson* test applies.

[52] This court has previously referred to the necessary showing as a "*quid pro quo* trade." *Freedman v. Adams*, 2012 WL 1345638, at *8 (Del. Ch. Mar. 30, 2012) ("[T]he Plaintiff has not approached pleading sufficient particularized facts to allow the Court to infer that a *quid pro quo* trade took place."). In other words, the Plaintiffs were required to plead

The Non-Employee Director Defendants received nothing in exchange for their approval of the executive awards. The grants of equity awards to all directors were approved based on the parameters of a stockholder-approved plan. Under the same plan, the independent directors then made a decision to grant awards to executive officers, again within the terms of the stockholder-approved plan. There was no "*quid pro quo* trade" here; the Board was simply implementing an equity incentive plan that had already been approved by stockholders within the specific parameters of that plan. In this situation, when making awards to Cummings and Cama, the directors "could disinterestedly asses the challenge to the individual Plan under which they did not benefit."[53]

Moreover, it cannot be ignored that the votes of Cummings and Cama were not required to approve the awards to the non-employee directors. And Plaintiffs have failed to plead any facts that would allow a reasonable inference that Cummings or Cama would not have supported the awards to the non-employee directors had their own awards not been approved. The *quid pro quo* theory does not hold together under these circumstances.

---

sufficient particularized facts to allow the Court to infer some type of "causal connection" between the two acts. *Id.*

[53] *Noerr*, 1997 WL 419633, at *10.

35

Because Plaintiffs have not pled any particularized facts that would support a reasonable inference that the Board engaged in a unitary transaction such that a reasonable doubt has been raised regarding the independence or disinterestedness of a majority of the Board,[54] the claim against the Executive Director Defendants must be dismissed for failure to make a demand on the Board or to plead demand futility.[55]

## III.   CONCLUSION

For the foregoing reasons, the motion to dismiss is GRANTED.  The claim for breach of fiduciary duty against all Defendants in Count I of the Complaint is dismissed under Court of Chancery Rule 12(b)(6).  The claim against the Executive Director Defendants in Count I is dismissed on the separate and alternative basis of Court of Chancery Rule 23.1.  The unjust enrichment claim in Count II against all Defendants is dismissed as duplicative of the breach of fiduciary duty claim.

**IT IS SO ORDERED.**

---

[54] Plaintiffs make a point to stress that Cummings and Cama were at the meetings at which their compensation was discussed and that Cama even proposed the number of restricted stock and stock options to be awarded to himself and Cummings.  Plaintiffs have not explained, however, how this fact alone is sufficient to justify a holding that all of the awards constituted a unified scheme.  Furthermore, the Complaint acknowledges that the awards to the executive officers were ultimately approved during an executive session of the Compensation Committee at which Cama and Cummings were not present.

[55] *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 854 A.2d 1040, 1044 (Del. 2004).